IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-00916-MEH

PATRICIA HERRERA,

     Plaintiff,

v.

KILOLO KIJAKAZI, Acting Commissioner,
Social Security Administration,

     Defendant.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge.**

     Plaintiff applied for Title II disability insurance benefits and Title XVI supplemental security income under the Social Security Act ("SSA"), 42 U.S.C. §§ 1381, 1382c(a)(3)(B), and 1383. An Administrative Law Judge ("ALJ") rendered a decision finding Plaintiff not disabled under the SSA's definition. The Appeals Council denied her Request for Review, thereby leaving the ALJ's decision final and subject to judicial review. Jurisdiction is proper under 42 U.S.C. § 405(g). The parties have not requested oral argument, and the Court finds it would not materially assist in the appeal's determination. After reviewing the parties' briefs and the administrative record, the Court affirms the ALJ's decision.

**BACKGROUND**

Plaintiff obtained her graduate equivalency diploma in 1998. AR at 199.[1] The Plaintiff worked in the café of a large wholesale store from 2006 to 2010, and as an assistant manager at a retail store in 2011. From 2013 to 2015 she worked in someone's home as a personal care worker. AR at 200, 215. The Vocational Expert ("VE") who testified at the administrative hearing classified Plaintiff's past relevant work as a fast food worker, retail assistant manager, and home attendant/personal care provider. AR at 49. Plaintiff last worked on July 1, 2015, but the record contains two different reasons for why her employment ended. In her treatment records (e.g., AR at 334, 684, 691), Plaintiff reports injuring her back while lifting her client, and the record also contains reference to an earlier car accident in 2009 (AR at 690). In her application, however, she stated that she was fired for a reason unrelated to her health. AR at 199.

Plaintiff had applied for disability benefits before filing the application that is subject of judicial review now. On November 20, 2015, the Social Security Administration issued its initial determination on that prior disability application.

The medical record begins November 10, 2016 when Plaintiff saw Nurse Practitioner Gronemeyer to establish care. At that initial appointment, she reported preexisting bulging discs and degenerative disc disease which she attributed to a work injury the year before. She described high blood pressure for which she had not taken medication over the preceding year as well as headaches (with related visual disturbances) unrelieved by ibuprofen. Lastly, she reported a diagnosis of fibromyalgia. She already was taking medications to manage her heart health; gastroesophageal reflux disease ("GERD"); and pain (consisting of Neurontin and two muscle

---

[1] This Court cites to the Administrative Record ("AR") found at ECF 27 and the CM/ECF page numbering for it.

relaxers). NP Gronemeyer diagnosed disc disorders with radiculopathy, back pain, and hypertension. AR at 334.

Plaintiff continued to see NP Gronemeyer for a variety of ailments. On December 9, 2016, her left eye developed a conjunctivitis infection. She no longer was experiencing headaches, and her upper back pain had eased. However, muscle relaxers were not relieving her low back pain, and she made new complaints of foot numbness and hip pain. AR at 329. NP Gronemeyer renewed the heart-related prescriptions and added non-steroidal anti-inflammatory ("NSAID") medications. AR at 982, 326. On January 11, 2017, NP Gronemeyer adjusted the Neurontin dosages to reduce daytime drowsiness. AR at 326. Later, on March 22, 2017, Plaintiff complained of nighttime snoring and daytime sleepiness, for which NP Gronemeyer ordered a sleep study. AR at 979. NP Gronemeyer prescribed Prilosec for her GERD complaints (although also noting Plaintiff's diet of fried and spicy foods). AR at 326, 329. On February 23, 2017, Plaintiff reported the onset of left knee pain without a precipitating injury event. AR at 982. On March 22, 2017, Plaintiff reported the onset of back pain and leg twitching. AR at 979. On April 25, 2017, Plaintiff complained of joint pains following a fall incident. AR at 976. The ongoing diagnoses were of "dorsalgia" (meaning back pain) and polyneuropathy. AR at 970, 973.

On February 23, 2017, Plaintiff described a bout of depression and anxiety that she was experiencing over her daughter's move into the household to recover from drug addiction. Plaintiff already was caring for grandchildren. NP Gronemeyer prescribed Celexa. AR at 982. On June 9, 2017, she complained of stress and pain after spending the full day at "DSS." AR at 973.

Plaintiff went to the hospital emergency room on August 18, 2017 with complaints of neck and shoulder pain and upper extremity neuropathy. Pain medications provided during the hospital visit successfully resolved the condition. Spasms, cervical strain, and cervical radiculopathy were

3

diagnosed. She denied any headache, dizziness, or shortness of breath despite not taking her blood pressure medications. AR at 619.

Radiographs were taken of Plaintiff's spine in September 2017. An MRI of her lumber spine showed protrusions at the L4-5 and L5-S1 disc sites without stenosis. AR at 277. The x-ray of her thoracic spine was normal (AR at 349), and the one of her cervical spine showed only minimal degenerative changes (AR at 348).

On August 27, 2017, Plaintiff saw NP Sivels (at the same medical practice with NP Gronemeyer) for complaints of abdominal numbness and tingling; weak and "rubbery" legs; and neck pain. The physical examination revealed only some sporadic areas of mild numbness. AR at 967. Plaintiff returned on September 15, 2017 with the same complaints. NP Sivels recommended pain treatment options other than pain medications (such as physical therapy). AR at 964.

Plaintiff began physical therapy on October 13, 2017. At that initial appointment, she reported severe neck pain (although her cervical spine was noted to have only mild degenerative disc disease and osteoarthritis). Plaintiff also complained of lumbar and right hip pain. AR at 305-310. Over the course of the subsequent physical therapy sessions, Plaintiff complained of pain flare-ups. However, she was not following symptom management techniques at home as instructed. One such pain exacerbation she attributed to working in her mother's yard. AR at 293. On another occasion, she reported being too busy caring for her twelve-year-old granddaughter to do home exercises. AR at 283. Nor was Plaintiff taking her NSAID or hypertension medications. AR at 961. Overall, Plaintiff reported either no improvement or even an increase of pain from physical therapy. AR at 958. During this period of time, Plaintiff underwent one round of acupuncture treatment, and NP Sivels referred her to Dr. Hess for nerve block injunctions (which

she did not pursue). The lack of progress led to the suspension of physical therapy on November 27, 2017. AR at 283.

Plaintiff claims a disability onset date of December 1, 2017. AR at 198. She was forty-eight years old at that time.

The focus of treatment during December 2017 was on numbness and swelling in her right leg. An ultrasound performed on December 11, 2017 was normal. AR at 347. By December 18, 2017, the condition had resolved. Lifestyle improvements were recommended not only for obesity and a pre-diabetic condition but also as a means to ease her pain complaints. Plaintiff again was referred to Dr. Hess for nerve block injections (which she did not seek). AR at 949-951.

On December 28, 2017, Plaintiff went to the hospital for a bout of chest pain, significant shortness of breath, and fatigue. She was experiencing a heart attack, and a catheterization with stent placement was performed. She was discharged the next day in an improved and stable condition. A coronary artery bypass grafting ("CABG") surgery was planned for later. AR at 531-546, 609, 615. Plaintiff returned to the hospital on January 1, 2018 with multiple cardiac symptoms, but testing showed no acute matter of concern. AR at 531, 546, 558.

A five-artery CABG was performed on January 12, 2018. AR at 445-501. She was discharged on January 18, 2017. AR at 438. At a follow-up appointment on February 14, 2018, the cardiologist, Dr. Gibson, described her condition as overall well with no angina. There was only a little shortness of breath after significant exertion and intermittent mild swelling. Dr. Gibson diagnosed coronary artery disease ("CAD"). AR at 360.

Plaintiff returned to the hospital on February 18, 2018 with shortness of breath. Testing revealed a mild to moderate pleural effusion and an elevated diaphragm. AR at 356-436. By February 26, 2018, the pleural effusion and shortness of breath conditions had resolved, and

Plaintiff was reporting no subjective complaints attributable to the diaphragm condition. AR at 786. She also complained of chest pain, but it was attributed to her sternum surgery site (and thus non-cardiac in nature). AR at 356. A CT scan of her chest and heart taken on April 12, 2018 showed an overall normal condition. AR at 365. Plaintiff's heart condition remained stable through April and May, 2018. AR at 561-564. On May 8, 2018, she was deemed to have successfully completed phase II of outpatient cardiac rehabilitation after just the initial session and without attending any exercise class. AR at 593.

CPAP machine use was recommended for the diaphragm condition. Given that recommendation and her report of preexisting obstructive sleep apnea, Plaintiff was referred to a sleep specialist. AR at 320, 388, 417-421, 571-573, 786. Dr. Junqueria performed a sleep study on May 6, 2018, following which mild obstructive sleep apnea with nocturnal hypoxemia was diagnosed. AR at 796-797. Plaintiff already was using oxygen supplementation as treatment for sleep-related hypoventilation and daytime fatigue. AR at 783-786. Dr. Boulos (a colleague of Dr. Junqueria) continued the oxygen supplementation and repeated the recommendation to start using a CPAP machine at the July 2, 2018 appointment. AR at 780.

Plaintiff continued to seek pain relief during the above period of time when her heart was the focus of treatment. On January 29, 2018, she told NP Hooshmand (a colleague of NP Gronemeyer), that recently prescribed Toradol had relieved her shoulder and neck pain. AR at 936. Her prescriptions for Neurontin and muscle relaxers were continued. AR at 564, 571. She continued to complain of low back pain as well as neuropathy in her hands. However, physical examinations remained normal. AR at 561, 564. She also complained of intermittent dizziness and poor balance for which the meclizine prescription was continued. AR at 564, 568, 780. She

6

reported some vertigo at her July 23, 2018 appointment with Dr. Gibson (although she had forgotten to take the medication for it). AR at 352.

Dr. Gibson described an overall stable heart condition at the July 23, 2018 appointment. AR at 352. Testing that August confirmed the presence of only mild abnormalities. AR at 590, 843. Dr. Gibson again described her cardiac health as overall unremarkable at the October 2, 2018 appointment. He attributed her complaints of shortness of breath after exertion to the lingering sternal discomfort at the surgery site. He continued her prescriptions and recommended exercise. Of note, the physical examination was normal. AR at 760.

On July 25, 2018, Plaintiff began treatment with NP Evert, complaining of joint pain. The physical examination on that day (as well as the one done by the hospital on August 15, 2018) was normal. AR at 866, 1050. On NP Evert's referral, Plaintiff began physical therapy on September 12, 2018. The physical therapist chose to focus treatment on neck pain (which was Plaintiff's primary complaint although the physical examination showed only moderate symptoms). AR at 1189-1197. Plaintiff cancelled a few sessions. On October 31, 2018, she asked to suspend treatment altogether until more MRIs could be taken, but the physical therapist explained that treatment may be delayed only for two weeks. AR at 1183-1185. Plaintiff was discharged from care on November 28, 2018 after the physical therapist lost contact with her. AR at 1186-88.

On August 3, 2018, Plaintiff filed the disability application that is subject of this ruling. She attributed her disability to neck and low back pain, fibromyalgia, peripheral neuropathy, heart problems, and acid reflux. AR at 198. On August 18, 2018, she dismissed her previous application before an ALJ had held an administrative hearing on it.

Plaintiff returned to Dr. Boulos on October 8, 2018. She reported experiencing dizziness with standing and shortness of breath with exertion. She must take a break after walking three to

four blocks. This treatment note also contains the only complaint of palpitations of record. Plaintiff was not compliant with CPAP machine and oxygen supplement use. She attributed her non-compliance to a poorly fitting mask. AR at 776. She saw Dr. Junqueira on October 22, 2018 for a CPAP mask evaluation (who reiterated the need for full CPAP compliance). AR at 774.

Plaintiff saw Dr. Moser on November 17, 2018 for a consultative physical examination. She was forty-nine years old at the time. She listed a variety of impairing ailments. She has chronic neck pain that radiates down her shoulders and into her arms. For the past five years, she has had low back pain that radiates down both legs, and for the past two years, she has suffered from neuropathic pain on the soles of her feet. Following her heart surgery, she has ongoing non-cardiac chest pain as well as shortness of breath with exertion (e.g., if walking farther than one block). She is fully compliant with CPAP machine use. Lastly, she reported GERD discomfort for which she has not been evaluated (e.g., no endoscopy performed), but it is relieved by medication. She is able to do household chores but with frequent breaks. Walking is limited to short distances. She has poor sleep. She smokes marijuana for pain relief. AR at 684-688.

Upon passive observation, Dr. Moser observed no functional impairments, and upon direct examination, he observed at most mild shortness of breath and some trigger points. She ambulated independently. In Residual Functional Capacity ("RFC") terms, Dr. Moser opined that Plaintiff can stand or walk for six hours, with no restriction on length of sitting. She can handle weight up to twenty pounds on an occasional basis and ten pounds on a frequent basis. She retains frequent use of her hands, but postural activities are limited to an occasional basis. *Id*.

Dr. Malmstrom conducted a consultative psychological evaluation on December 13, 2018. Plaintiff repeated the same physical health-related impairments that she had reported to Dr. Moser. Upon examination, Dr. Malmstrom observed impairments (a slight hand tremor, low energy and

an "underactive" presentation, obvious pain, stiff sitting, and a mild speech deficit) that others have not. As for her mental health, she described various stressors and traumas since 2005 (divorce, arrests, Vicodin dependency, car accident, and suicide attempts). Her thirteen-year-old granddaughter lives with her, for whom Plaintiff is the full-time caregiver. Plaintiff complained of anxiety-related symptoms. Dr. Malmstrom observed Plaintiff to have a flat affect; various depression and anxiety-related signs; and poor short-term memory. Dr. Malmstrom diagnosed somatic symptom disorder with pain as the predominate feature; moderate to major depressive disorder; anxiety secondary to medical conditions; and a mild neurocognitive disorder. In RFC terms, he opined that she could follow simple instructions (as well as straightforward complex instructions) and interact socially in the workplace (albeit with breaks). However, her endurance would be limited (in an unspecified way). AR at 690-695.

Plaintiff saw Dr. Paruchuri on February 6, 2019 for a follow-up appointment regarding her obstructive sleep apnea. She complained of a poor mask fit and of shortness of breath with normal exertion. Dr. Paruchuri regarded the sleep-related hypoventilation condition as resolved with CPAP use. AR at 771.

Plaintiff had ongoing complaints of joint pain, for which NP Evert referred her to a neurologist and orthopedist. AR at 869, 873, 876. Radiographs of her knee, hips, and spine remained unremarkable. AR at 1042-1048. Plaintiff saw an orthopedist, Dr. Likes, on February 26, 2019. He observed normal ambulation. There was tenderness in the right knee but with good range of motion and strength. There was pain with motion in the left knee (as well as numbness and nerve damage in the left lower extremity from the grafting surgery). AR at 747. MRIs were taken of Plaintiff's knees on March 16, 2019. There was cartilage loss in the right knee with mild chondromalacia and degeneration, and there was a cartilage defect in the left knee with

degeneration, a tear, and small effusion. AR at 1170-1172. Dr. Likes did not regard the defects as significant enough to warrant surgical repair. Plaintiff declined his recommendation for injection therapy. AR at 744.

NP Evert filled out a form rating Plaintiff's RFC on March 25, 2019. She limited Plaintiff to walking less than one block's distance and standing/walking for less than one hour total in a workday. Plaintiff only can sit for two hours total in a workday. Plaintiff also will need to take a break every two hours for thirty to sixty minutes at a time. She can handle weight of less than ten pounds on only an occasional basis. Plaintiff can use her right hand and finger for half of a workday and her right arm for a fifth of a workday. She retains greater use of her left extremity, with hand and finger use for three-quarters of a workday, but with left arm reaching limited to a fifth of the time. Plaintiff will miss more than four days of work a month. NP Evert attributed these work impairments to knee pain, multiple joint pain, and lumbago. NP Evert also mentioned dizziness, lightheadedness, and drowsiness, but as a medication side-effect—rather than caused by a medical condition (such as cardiac abnormality). AR at 700-701.

Indeed, NP Evert made no mention of heart health or cardiac-related impairments in her RFC statement. Contemporaneous treatment records show an overall stable heart condition with only mild abnormalities. AR at 799, 1139-1138. Plaintiff's complaints were attributed instead to the unrelated conditions of bronchitis (with flu-like body aches) and obesity. Physical examinations were normal. AR at 757, 788, 827-831, 884, 1148-1160.

Plaintiff saw NP Evert on May 1, 2019 complaining of feeling tired and sluggish (but without any cardiac-related symptoms). She was not using her CPAP machine, and the physical examination was unremarkable. NP Evert continued her prescriptions (which now included hydrocodone and Tramadol), and she advised Plaintiff to exercise and begin CPAP use. AR at 757.

On July 19, 2019, Plaintiff returned from California with mild cold symptoms. Acute sinusitis and RSV infection were diagnosed. AR at 856, 892. Plaintiff also complained of back pain, and her cholesterol was high. NP Evert recommended the conservative measures of improved lifestyle, weight loss, exercise, and blood pressure control. AR at 892. On August 7, 2019, NP Evert expressed Plaintiff's pain complaints in terms of chronic pain syndrome, and she added a prescription for Norco. AR at 896.

MRIs were taken of Plaintiff's spine on August 26, 2019. The one of her cervical spine showed two herniations (at C5-6 and C6-7) without stenosis but with loss of curvature. The cervical condition was overall unchanged and stable. The one of her lumbar spine showed a herniation at L4-5 with mild to moderate stenosis (representing a worsened condition) and a herniation at L5-S1 with foraminal narrowing but stable. AR 703-705.

Plaintiff saw PA Johnson on November 11, 2019 for a neurosurgical evaluation. She complained of neck pain with upper extremity radiculopathy and headaches. She also reported dizziness (despite taking vertigo medication) with falls. She described low back pain with radiculopathy and a right leg that gives out. The physical examination was overall normal except for tenderness in the spinal muscles and loss of motion range. PA Johnson also reviewed the recent MRIs. He diagnosed cervical myofascial pain caused by spasms as well as headaches. The lumbar pathology was not severe enough to warrant surgical intervention. For both conditions, PA Johnson recommended conservative treatment measures consisting of ESI/facet block injections, over-the-counter pain medication, physical therapy, and lifestyle improvement. AR 1399-1404.

An EMG study was performed on Plaintiff's right upper extremity on December 9, 2019. It showed carpal tunnel syndrome in the right wrist of mild severity. AR at 1420. Plaintiff complained of chronic hand pain at a January 7, 2020 appointment with NP Evert.

The last treatment note of record is dated January 28, 2020 at which time Plaintiff saw NP Evert for depression. NP Evert diagnosed generalized anxiety disorder and recurrent major depression (of moderate severity). Lexapro was prescribed. AR at 1425.

Plaintiff testified at the administrative hearing held February 26, 2020. Plaintiff identified pain (in her back, shoulder, and extremities) as her primary impairment which she attributed to an earlier car accident and a 2015 workplace injury. The pain limits her ability to move in many respects. She can stand no longer than twenty minutes and sit no longer than thirty minutes. She can walk no farther than one block. She cannot mop, vacuum, or sweep. She has a limited ability to lift when grocery shopping, and she does not have a driver's license. She relies on her fifteen-year-old granddaughter to perform household chores. AR at 36-40.

It is difficult for her to keep her neck up, and pain and numbness reduce hand use, dexterity, and grip strength. (This Court notes that the treatment record does not confirm her statement that carpal tunnel surgery was scheduled.) She has pain in her hip and lower extremities. AR 43-46. She identified discomfort, fatigue, and shortness of breath from walking or prolonged activity, a symptom which she attributed to her heart condition. AR at 41-42. She takes an hour-long nap every day. AR at 46. Cold weather exacerbates her pain. AR at 46.

She takes Neurontin and hydrocodone for pain, but they cause drowsiness. AR at 42. She smokes marijuana for both pain relief and sleep. AR at 47. She takes an anti-depressant which is helpful at easing her depression. AR at 44.

Also testifying at the hearing was a VE. Of Plaintiff's past relevant work, two were classified at the SVP 2 level: cashier II and fast food worker. AR at 49. The ALJ proposed a hypothetical RFC (both physical and mental) consistent with what would be assessed for Plaintiff,

and the VE opined it would permit the performance of the cashier II job. AR at 50. The VE identified a variety of other kinds of jobs that would be amenable as well. *Id*.

## THE FIVE-STEP PROCESS FOR DETERMING DISABILITY

To qualify for SSA benefits, the claimant must meet be insured, younger than sixty-five years of age, and disabled. 42 U.S.C. §§ 416(i), 423, 1382. A five-step sequential evaluation process guides the determination of whether an adult claimant meets SSA's definition of disabled. For SSA purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382(c)(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

Step One asks whether the claimant is presently engaged in substantial gainful activity. If he is, disability benefits are denied. 20 C.F.R. §§ 404.1520, 416.920. Step Two is a determination of whether the claimant has a medically severe impairment or combination of impairments under 20 C.F.R. §§ 404.1520(c), 416.920(c). If the claimant shows only a minimal effect on the ability to do basic work activities, he is not eligible for disability benefits. 20 C.F.R. 404.1520(c). Step Three tests whether the condition equates with a listed impairment deemed to be of disabling severity. 20 C.F.R. §§ 404.1520(d), 416.920(d). If a Listing is not met, then disability is not presumed, and the analysis progresses to an RFC assessment at Step Four. The RFC is an administrative determination based on the full evidentiary record of the most a claimant can do despite his impairments. 20 C.F.R. §§ 404.1545(a)(1), (a)(3), 404.1546(c). The RFC is used at both Step Four and Step Five. Step Four requires the claimant to show how his impairment(s) and

RFC prevent him from performing his past jobs. If the claimant remains capable of previous employment, he is not disabled. 20 C.F.R. §§ 404.1520(e), (f), 416.920(e) & (f).

Finally, if the claimant establishes a prima facie case of disability at Step Four, the analysis proceeds to Step Five where the ALJ determines whether a claimant with the same vocational profile (age, education, work experience, and RFC) can perform other work in the national economy. 20 C.F.R. §§ 404.1520(g), 416.920(g).

## ALJ's RULING

At Step Two of the disability analysis, the ALJ determined Plaintiff to have the severe impairments of cervical and lumbar degenerative disc disease; CAD following a heart attack and a five-vessel CABG; carpal tunnel syndrome; and depressive and anxiety disorders. AR at 19.

Of the physical conditions that count as severe impairments, the ALJ found none to be of Listing-level severity to permit a Step Three finding of disabled based on the medical evidence alone. There was no objective medical evidence to meet the criteria needed to meet the Listing sections for cardiac or spinal conditions.

Nor did the record establish the criteria for the mental health Listing. The ALJ considered Plaintiff's mental health condition in terms of the four broad domains of mental functioning of the Psychiatric Review Technique ("PRT"), 20 C.F.R. § 404.1520a. For three of them, the ALJ found only mild impairment. In support thereof, the ALJ noted the apparent lack of difficulty with following instructions and memory. Plaintiff did not even allege difficulties with social interactions, adaptation, or self-care, and she identified no mental impediment to daily life activities or household chores. Plaintiff has been able to care for grandchildren in the household. As for the fourth domain—concentration, persistence, and pace—the ALJ found a moderate degree of impairment. AR at 20-21. On one hand, the ALJ acknowledged Plaintiff's allegation of

difficulty with concentration and task completion generally. On the other hand, Plaintiff remained able "to prepare meals, watch TV, read, and handle her own medical care," the record contained no concentration and attention test results indicative of such difficulty. AR at 21.

Because there was no marked or extreme degree of limitation, the "paragraph B" criteria were not met. In regard to the Listing section's "paragraph C" criteria, the ALJ saw no "evidence of either medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that has been ongoing" and result in improved functional ability. *Id*.

At Step Four, the ALJ assessed Plaintiff's RFC after reviewing the record evidence and testimony. The ALJ assessed Plaintiff capable of light work, albeit with the postural activities of bending, squatting, and kneeling limited to just an occasional basis. She can perform "over chest level work" occasionally, and she can use her hands to handle and finger frequently (but not constantly). She must avoid non-hazardous work environments. As for the mental work-related demands, the ALJ restricted Plaintiff to jobs with an SVP of 2 or less and "rote and repetitive tasks." *Id*.

In assessing the physical RFC, the ALJ noted Plaintiff's subjective allegations of the claimed conditions' severity and impairing effects. AR at 22. Whereas objective testing and the treatment history confirm some degree of limitation, they leave Plaintiff's allegations of a disabling degree uncorroborated. The ALJ noted the provision of cardiac surgery, physical therapy, and medications for her various ailments. The ALJ further noted Plaintiff's independent ambulation, lack of cardiac complaints, and normal physical examination observations. Not only was Plaintiff non-compliant with tobacco cessation and CPAP machine use, but a thorough neurosurgery evaluation yielded a recommendation for only conservative, non-surgical treatment measures. AR at 22-24.

Regarding the mental RFC, the ALJ stressed the very limited nature of the provided mental health care. There was no formal treatment of any kind. Instead, it consisted only of prescriptions from her primary care providers. The ALJ conceded some observations of a depressed and anxious mood as well as a one-time short-term memory deficit. Otherwise, the mental status examinations of record have been consistently unremarkable whether in terms of speech, behavior, or appearance. The ALJ credited Plaintiff with having some degree of impaired concentration, enough to preclude complex or detailed tasks. However, Plaintiff retained the capacity to perform simple tasks that are learnable in a month or less. In other words, Plaintiff can perform unskilled work with rote and repetitive tasks. AR at 24-25.

Plaintiff described a fairly limited range of daily life activities, but the ALJ did not find it supportive of her disability claim. First, the medical evidence simply did not confirm the degree of limitation alleged. Second, the record references daily life activities that imply a greater functional ability. AR at 25.

The ALJ considered the medical opinion evidence of record. The ALJ found the report of the non-examining medical advisor, Dr. Platter, generally persuasive as to Plaintiff's ability to perform the physical demands of work. However, the ALJ added to Dr. Platter's RFC rating restrictions on handling, fingering, and above chest level activity, and the ALJ rejected Dr. Platter's temperature-related work restriction. AR at 26.

The ALJ regarded the RFC rating of the consultative examiner, Dr. Moser, as persuasive and consistent with the medical evidence. Dr. Moser noted Plaintiff's improved and stable heart condition and overall normal physical examination findings. *Id*. In comparison, the ALJ did not find NP Evert's RFC opinion persuasive. The impairments she described were unsupported by the

normal physical examination findings, daily life activities, and treatment history. Nor did NP Evert provide an explanatory basis to support her RFC rating. *Id*.

The ALJ regarded as unpersuasive the opinion of Dr. Harrison, the non-examining psychologist advisor, who saw no severe mental impairment. Dr. Harrison's determination was nonetheless plausible given the "very limited" evidence of mental impairment. However, the ALJ chose to give Plaintiff the benefit of the doubt. *Id*. The ALJ agreed with Dr. Malmstrom, the consultative psychological examiner, that Plaintiff should be limited to simple instructions. However, the ALJ rejected Dr. Malmstrom's opinion of reduced social interactions as not well-explained and contrary to the normal mental status examinations of record which show good cooperation. *Id*.

Relying on the VE's testimony, the ALJ found Plaintiff's RFC to permit her return to her past work. AR at 27. The ALJ therefore concluded at Step Four of the disability analysis that Plaintiff is not disabled. In the alternative, the ALJ found the Step Five inquiry also to direct the conclusion of not disabled based on Plaintiff's ability to perform other kinds of amenable work. *Id*.

**STANDARD OF REVIEW**

Judicial review is limited to two inquiries: (1) whether the correct legal standards were applied and (2) whether the final decision is supported by substantial evidence in the record as a whole. *Williamson v. Barnhart*, 350 F.3d 1097, 1098 (10th Cir. 2003); *White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2001).

Reversal is appropriate if the ALJ either applies an incorrect legal standard or does not demonstrate reliance on the correct one. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citing *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996)). If the ALJ applied the correct

standard in making a determination, then the Court considers whether the fact-findings enjoy evidentiary support.

A factual determination requires the support of competent substantial evidence from the administrative record. The term "substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." The threshold for such evidentiary sufficiency is not high: it is "more than a mere scintilla." *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (internal citations omitted). In making that determination, the Court may not re-weigh the evidence nor substitute its judgment for that of the ALJ. *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (citing *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991)). However, the Court still must "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009). Thus, the function of the Court's review is "to determine whether the findings of fact . . . are based upon substantial evidence and inferences reasonably drawn therefrom. If they are so supported, they are conclusive upon the reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970); *Bradley v. Califano*, 573 F.2d 28, 31 (10th Cir. 1978).

## **ISSUES ON APPEAL**

## I.     **NP Evert's Opined Work Restrictions**

The ALJ considered the opinion evidence under 20 C.F.R. §§ 404.1520c and 416.920c (AR at 21), which is the standard that governs applications filed after March 27, 2017. Plaintiff filed her application in August 2018.

Under the new standard, an ALJ no longer defers or gives special weight to medical source opinion. Instead, the persuasiveness of an opinion from a medical source (of whatever kind

whether a treating[2] doctor or one-time examining consultant) is measured against certain factors. The two most important factors are (1) "supportability," which is the extent to which the source supports his or her opinion with objective medical evidence and an explanation, and (2) its "consistency" with the evidence from the other medical and nonmedical sources. 20 C.F.R. § 416.920c(b)(2) and (c)(1)-(2). *See also Miles v. Saul*, No. 20-cv-01456-WJM, 2021 WL 3076846, at *2-3 (D. Colo. July 21, 2021) (summarizing the new standard). In evaluating the ALJ's rationale for how persuasive a medical opinion is, the Court must "determine whether it is supported by such relevant record evidence as a reasonable mind might accept as adequate to support a conclusion." *Victoria Jean G. v. Kijakazi*, No. 20-4053-JWL, 2021 WL 4168124, at *5 (D. Kan. Sept. 14, 2021).

Plaintiff contends that the ALJ fell far short of a proper consideration of medical opinion evidence. For example, she alleges the decision "is devoid of any valid explanation" of NP Evert's own treatment notes and the ample supportive evidence. Plaintiff furthers that the ALJ relied on boilerplate reasoning and failed to link the evidence to the finding of unpersuasiveness. This Court disagrees that the ALJ's rejection of NP Evert's opinion suffers from such a wholesale reasoning defect or that it lacks the support of competent, substantial evidence.

One shortcoming that Plaintiff does *not* mention is that the ALJ *overlooked* any evidence relevant to the consideration of NP Evert's statement. The thrust of Plaintiff's argument instead is that the ALJ's discussion should have been more detailed and comprehensive. However, Plaintiff does not demonstrate how the governing standard requires analysis to *that* depth or express consideration of every item of evidence. Nor, ultimately, does Plaintiff show how the instant record

---

[2] Although the new standard no longer defers to treating sources, this Court notes that NP Evert was Plaintiff's primary care provider on March 25, 2019, when she filled out the form regarding work-related limitations. AR at 700-701.

necessitated an analysis deeper than what the ALJ provided. The reasons the ALJ gave for discounting NP Evert's RFC rating all were relevant and accurate.

Plaintiff is unsuccessful in her attempt to call the soundness of the ALJ's reasoning into doubt. First, she overstates the degree to which the record corroborates NP Evert's opinion. She emphasizes the frequency and widespread nature of the pain complaints she made over the full course of the treatment record. However, subjective pain allegations alone are insufficient to support a pain-based disability claim. *Bradley*, 2018 WL 6168066 at *9. Corroboration with other kinds of evidence is required, and the ALJ's inclusion of the objective forms of medical evidence into the analysis was proper. With respect to the objective medical record, Plaintiff points to those physical examination observations of pain manifestations and radiographs that do indicate some underlying orthopedic or other physical health defect. The ALJ did not wholly disregard evidence of medical ailments (or indeed Plaintiff's subjective pain complaints). To the contrary, the ALJ assessed an RFC that made accommodation for a significant degree of restriction. The dispositive point instead is how those particular positive physical examination findings were few and isolated. Likewise, the defects that the radiographs and other tests showed were insufficiently severe to corroborate the degree of impairment that NP Evert described (or that Plaintiff alleged). This Court adds that NP Evert attributed the work restrictions to multiple joint pain (including in her knees), lumbago, and medication side-effects—but *not* to neck pain, fibromyalgia, or heart health.

Plaintiff argues that the ALJ should have addressed with greater detail the content of NP Evert's treatment notes. However, Plaintiff does not identify what in them would have yielded a different outcome or how the ALJ's general reference to overall normal treatment findings is inaccurate factually. The ALJ did not simply cite "normal examination findings" as generic boilerplate. Plaintiff cites *Silva v. Saul*, No. 19-913 WJ/KK, 2020 WL 4220862 (D.N.M. Jul. 23,

2020), but it is distinguishable. The ALJ in *Silva* relied on inaccurate, incomplete, and decontextualized statements of the evidence and just a single mental status examination of a generally normal presentation to discount the limitations that seven medical sources had opined. *Id* at *11. Here, by contrast, the treatment records (from both NP Evert, herself, and on the whole) do show normal or unremarkable examination findings on a consistent basis. Plaintiff leaves unclear why further discussion was needed.

NP Evert filled out a "Physical Assessment" form consisting of questions that asked her to rate different aspects of functional ability. Plaintiff cites *Phillips v. Colvin*, 67 F. Supp. 3d 1286 (D. Colo. 2014) for the general rule that an ALJ may not disregard a medical opinion statement (especially one from a treating source) simply because it consists of a check box form. The ALJ must "go further," Plaintiff maintains, and examine the source's treatment records to determine whether they contain evidence supportive of the opined limitations. If they do not, the ALJ must identify what the contrary evidence is. *Id*. at 1291. That is what the ALJ did with respect to NP Evert. The ALJ also noted how NP Evert did not provide her own explanation to support the substantial degree of restrictions that she was imposing. The lack of an accompanying explanation is a relevant factor, especially in this situation of work restrictions that stand in sharp contrast to what the record otherwise indicates.

Another relevant factor is a claimant's daily life activities and how they relate to extreme limitations opined by a medical source. *Newbold v. Colvin*, 718 F.3d 1257, 1266 (10th Cir. 2013). The ALJ noted Plaintiff's daily life activities as an aspect of the record that was inconsistent with NP Evert's opinion. AR at 26. Elsewhere in the decision, the ALJ identified those daily life activities that he regarded as weighing against a finding of disabled. They include the ability to care for herself and grandchildren; to do a wide range of household chores; and to walk for

exercise.[3] The ALJ conceded the limited relevance of this evidence, but he still included it in the overall analysis because they indicated "a far greater" functional ability than what "a disabling degree of symptomatology would suggest." AR at 25. That reasoning applies equally to consideration of both the credibility of Plaintiff's allegations and the persuasiveness of NP Evert's substantial work restrictions. Plaintiff faults the ALJ for not specifying exactly what daily life activity is inconsistent with NP Evert's opinion and not expressly stating how not. This Court finds ALJ's reasoning clear enough to stand as is.

The claimant in *Bradley* objected to how the ALJ had discounted the credibility of her fibromyalgia allegation without building "an accurate and logical bridge between the evidence and his credibility determination.'" 2018 WL 6168066 at *10. That objection refers to how the ALJ's consideration of the important evidence should progress logically along a demonstrated path of reasoning to the ALJ's conclusion. *Correa v. Berryhill*, No. 16-cv-01314-LF, 2018 WL 1472480, at *8 (D.N.M. Mar. 26, 2018). This Court disagrees that the decision at issue here lacks such a bridge. To the contrary, the ALJ's reasoning is clear, and his discussion is substantive enough to permit meaningful judicial review. This case also is distinguishable from *Bradley* in which an ALJ inadequately articulated how the claimant's (very limited) daily life activities and an overly selective record review contradicted the symptoms that she alleged her fibromyalgia, an inherently subjective and sporadic medical condition, were causing. 2018 WL 6168066 at *10-12.

Plaintiff complains that the ALJ leaves unclear why he regarded the work restrictions that NP Evert described as excessive. However, the ALJ's reasoning is readily apparent. The remainder of the record evidence (including NP Evert's own treatment notes) simply does not indicate the

---

[3] This Court adds that Plaintiff does not drive, but that is because she lacks a driver's license. The record also contains reference to doing yardwork for her mother and a trip to California, which the ALJ did not include.

presence of medical conditions that either singly or in combination are severe enough to pose a disabling degree of impairment. NP Evert's opinion statement likewise stands in sharp contrast to what Dr. Moser observed and to the RFC rating that Dr. Platter advised. Instead, it is Plaintiff who leaves her arguments of reasoning defects unsubstantiated. Plaintiff does not explain how either the treatment records or her daily life activities actually corroborate NP Evert's work restrictions— and thereby illustrate how the ALJ's reasoning is flawed. What is left is a disagreement over the degree of impairment that the record shows, and this Court should defer to the ALJ's resolution of the evidence.

## II.    Dr. Malmstrom's Opined Work Restrictions

Dr. Malmstrom conducted a consultative psychological evaluation on December 13, 2018 and wrote a report setting forth restrictions on Plaintiff's ability to perform the mental demands of work that he believed are appropriate. AR at 690-695. At issue is Dr. Malmstrom's opinion about Plaintiff's ability to perform the *social* aspects of work. Dr. Malmstrom described Plaintiff as "a pleasant and agreeable lady who would be able to cooperate with both supervisors and coworkers." AR at 694. This Court adds that Plaintiff neither complained to Dr. Malmstrom about a social difficulty, and Dr. Malmstrom observed no such problem in her presentation and behavior at the examination. Nevertheless, Dr. Malmstrom furthered that she could cooperate with supervisors and coworkers "only for limited periods of time in a normal workplace setting." *Id*. He did not quantify how much social break time she would need. Nor did he identify the reason for the limitation. The ALJ decided against including the opined social restriction in the RFC assessment. Support for it was "not well explained," the ALJ noted, and the existence of such a restriction was inconsistent with the various mental status examinations of record which showed "good cooperation" and were otherwise normal. AR at 26.

Plaintiff argues that the ALJ's explanation for rejecting that part of Dr. Malmstrom's opinion was inadequate. First, she contends that the ALJ overlooked ample supportive evidence. What supportive evidence the record contained (and the ALJ overlooked), Plaintiff does not identify. Plaintiff herself did not include a social impairment in her disability allegation.

Second, Plaintiff regards the normal mental status examinations or her ability to cooperate well with treating sources as an erroneous basis for discounting the opined restriction. Her argument, in other words, is that the setting of a doctor's appointment does not permit an accurate measurement of behavior. Perhaps interaction with a treating source in a therapeutic setting (or in Dr. Malmstrom's case, a one-time examining consultative source) differs in nature from what would occur in the work environment. Whether that automatically renders observations of social interaction unreliable is unclear. Plaintiff cites to *Shawn A.W. v. Kijakazi*, No. 20-cv-00663-SH, 2022 WL 807361 (N.D. Okla. Mar. 16, 2022) in support, but that case concerns a fundamentally different situation. The record in that case well-documented the claimant's extreme social difficulties (in the form of violent and aggressive reactions to others). Mental status examinations were intermittently positive for impaired insight, judgment, and impulse control. Medical sources opined that the claimant had social limitations. However, the RFC that the ALJ assessed made no accommodation for a social impairment. In support thereof, the ALJ misstated the record and overstated the degree of contradictory evidence. The ALJ referenced a period of improvement (for which there was no conclusive evidence), and even if the claimant had experienced improvement, it had occurred in the highly structured, therapeutic setting of inpatient hospitalization.

This Court adds that the medical advisor, Dr. Harrison, did not regard any aspect of Plaintiff's mental health to rise to the level of a "severe impairment" for inclusion at Step Two of the disability analysis. The ALJ himself regarded the evidence of a mental impairment to be "very

limited." The ALJ decided to give Plaintiff "the great benefit of the doubt," and count it as a "severe impairment" nonetheless. AR at 26.

The ALJ specifically addressed this particular part of Dr. Malmstrom's opinion, and he explained why it lacked both support and consistency with the greater record. As such, as he did when rejecting NP Evert's work restrictions, the ALJ stated a sufficient reason for finding it unpersuasive and for excluding it from the RFC assessment.

## III.    The Sufficiency of the RFC Assessment

Plaintiff objects to another aspect of the ALJ's consideration of mental disability. For purposes of the RFC assessment at Step Four of the disability analysis, the ALJ found her capable of performing "jobs with a SVP 2 or less, with rote and repetitive tasks." AR at 21. Plaintiff contends that the ALJ made that assessment without explaining how it accommodates the moderate limitation on concentration, persistence, and pace that the ALJ determined at Step Three. This Court sees no error.

Jobs that entail an SVP of 1 and 2 to which the ALJ limited Plaintiff corresponds to the "unskilled" work category. SSR 00-4p. The unskilled work level constitutes the basic mental demands of employment. At the minimum, a person must be able "(on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." SSR 85-15. Unskilled work is "work which needs little or no judgment [and entails] simple duties that can be learned on the job in a short period of time." 20 C.F.R. § 404.1568(a). It is limited to "simple work-related decisions." *C.H.C. v. Comm'r*, No. 20-cv-02428-KLM, 2022 WL 950433, at *5 (D. Colo. Mar. 29, 2022). A worker also must have the minimum ability to maintain concentration and attention for two-hour segments. *Jaramillo v. Colvin*, 576 Fed.Appx. 870, 875-76 (10th Cir. 2014).

There is no "blanket rule," Plaintiff emphasizes, "that a generally-stated limitation to 'unskilled' work (or 'simple' work) will be sufficient to account for any or all mental health impairments that the ALJ has found." ECF 28 at 20 (citing *Marquez-Hernandez v. Comm'r*, No. 17-cv-01513-MSK, 2018 WL 2328401, at *5 (D. Colo. May 22, 2018)). Plaintiff is correct that an RFC for unskilled work (or for simple, routine, and repetitive tasks) does not automatically account for moderate mental health impairments. That general rule derives from the Tenth Circuit opinions of *Evans v. Colvin*, 640 F. App'x 731, 738 (10th Cir. 2016); *Vigil v. Colvin*, 805 F.3d 1199, 1204 (10th Cir. 2015); *Jaramillo*, 576 F. App'x at 876; and *Chapo v. Astrue*, 682 F.3d 1285, 1290, n.3 (10th Cir. 2012).

That is not to say an RFC for unskilled work (without any specific restrictions) could not account for moderate impairments if, for example, the accommodation is obvious. *Marquez-Hernandez*, 2018 WL 2328401 at *4. Alternatively, it is permissible if a medical source opines that a claimant's mental health condition permits general unskilled work. *C.H.C.*, 2022 WL 950433 at *4. Otherwise, an ALJ must translate a claimant's mental health impairments into the work-related terms of an RFC assessment (and propound that RFC assessment in a hypothetical to a VE). *Id*. There are several ways to create such a link. An ALJ can incorporate the mental health impairments into the RFC assessment "by stating how the claimant was limited in the ability to perform work-related activities." *Marquez-Hernandez*, 2018 WL 2328401 at *4. Excluding jobs that involve complex tasks, close supervisions, or meaningful interaction with supervisors or peers can be one way to address moderate limitations. *Id*. In any event, determining the adequacy of an RFC assessment is analyzed on a case-by-case basis. *Id*. at *5.

Plaintiff challenges the link the ALJ draws between the RFC assessment and the moderate limitation on concentration, persistence, and pace that he found at Step Three. Plaintiff articulated

26

no *specific* assertion of a concentration problem caused by a medical condition in her application. Nor did she describe any mental health problems that had interfered with her ability to work. The ALJ found Plaintiff's daily life activities to indicate adequate functioning, and there was no objective medical evidence of difficulty with concentration and attention tests. Nevertheless, at Step Three of the disability analysis, the ALJ acknowledged her claim of "limitations in concentrating generally and completing tasks." AR at 21. In other words, the ALJ based the finding more on giving Plaintiff the benefit of the doubt than on a demonstrated specific medical problem.

Reliance on a state agency mental health advisor report is one way to create a link between a mental impairment finding and an RFC restriction. *Parker-Ramey v. Berryhill*, No. CIV-16-574-JHP-SPS, 2018 WL 1221920, at *3-4 (E.D. Okla. Feb. 9, 2018); *Romo v. Berryhill*, No. 16-cv-2248-WJM, 2017 WL 3911071, at *4 (D. Colo. Sept. 7, 2017) (citing *Smith v. Colvin*, 821 F.3d 1264, 1268-69 (10th Cir. 2016)). Here, Dr. Harrison opined that Plaintiff has no severe mental health condition in the first place, an opinion which the ALJ regarded as "plausible" given the "very limited" evidence. AR at 26. The ALJ discounted that medical opinion in order to give Plaintiff the benefit of the doubt. It follows that Dr. Harrison's report shows no mental work-related restriction *greater* than what the ALJ assessed, and in that sense, it supports the ALJ's RFC assessment.

Nor did the ALJ use the unskilled work level restriction as a blanket catch-all to account for Plaintiff's mental impairments. Indeed, the ALJ did not even mention "unskilled work" in the RFC assessment. Rather, the ALJ limited Plaintiff to "jobs with a SVP 2 or less" that coincides with unskilled work—to which he added the limitation to "rote and repetitive tasks." AR at 21. This Court sees no *Marquez-Hernandez* error. The ALJ credited the presence of a severe mental health impairment (and a resulting moderate reduction of concentration-related ability) and stated

specific ways in which it impacted her ability to work. Moreover, the decision shows the basis for how the ALJ reached that conclusion.

Plaintiff does not demonstrate how either finding (of a moderate concentration impairment and of restrictions that effectively limit her to unskilled work) *overstates* her true functional ability. Nor does the ALJ's discussion of the matter appear obviously deficient. Mental health was not a focus of either her disability claim or the medical care that she had sought, and the record shows very little mental health treatment provided.

VE testimony was needed to complete the determination. The ALJ proposed a hypothetical that tracked the RFC assessment. The VE answered by identifying a past job that Plaintiff had and other kinds of work that would be amenable. AR at 50.

## CONCLUSION

Plaintiff complains that the decision lacks an adequate explanation for why the ALJ assessed the RFC that he did. Having reviewed the parties' arguments and having independently reviewed the entire record, the Court finds the ALJ's decision to enjoy evidentiary support and to be consistent with governing law. The ALJ's discussion of the record evidence was accurate, and he applied the correct analysis to measure the extent to which Plaintiff remains able to work. Plaintiff fails to call the reasonableness of the ALJ's reasoning and conclusions into doubt. Consequently, the Court sees no grounds warranting reversal or remand.

Accordingly, the ALJ's determination that Plaintiff is not disabled is AFFIRMED. The Clerk of Court shall enter judgment in Defendant's favor and shall close this civil action.

Entered this 5th day of January, 2023, at Denver, Colorado.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge